UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KATHY KRUSE as Independent Administrator, | ) | |
| Of the Estate of MICHAEL KRUSE, Deceased; | ) | |
| PORSCHA CAYENNE KRUSE, a minor by her | ) | |
| Guardian and next friend, ROSALIE SKEEL; | ) | |
| MICHAEL JOSEPH KRUSE, a minor, by his | ) | |
| Guardian and next friend, ROSALIE SKEEL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 04 C 6130 |
| | ) | |
| COUNTY OF COOK, a municipal corporation | ) | Judge Rebecca R. Pallmeyer |
| TOM DART, in his official capacity as Sheriff | ) | |
| of Cook County, Illinois, Deputy Cook County | ) | |
| Sheriff VERNELL TIMS, employee of TOM DART | ) | |
| Sheriff of Cook County, Illinois, in his Official | ) | |
| and individual capacity, and JACQUELINE JACK, | ) | |
| ROSETTA FRASER, BESSIE BROWN, clinical | ) | |
| nurses employed at Cermak Hospital, in their | ) | |
| individual and official capacity, CITY OF PALOS | ) | |
| HILLS, a municipal corporation, and Detective | ) | |
| McMAHON, in his official and individual capacity | ) | |
| as a police officer for the City of Palos Hills, | ) | |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

On May 26, 2004, 43-year-old Michael Kruse died in the Cook County Jail after being arrested by Palos Hills Police. Kruse's survivors, Plaintiffs Kathy Kruse, Porsha Cayenne Kruse, and Michael Joseph Kruse, filed this action against Palos Hills and Cook County officials, stating claims under 42 U.S.C. § 1983 and state tort law. Named Defendants are the County of Cook, Sheriff Sheahan, several deputy sheriffs and nurses employed by the County, the Village of Palos Hills (the "Village"), and Palos Hills Detective John McMahon. As against the Village and Detective McMahon (the "Palos Hills Defendants"), Plaintiffs allege that Kruse was arrested and detained without probable cause in violation of his rights under the Fourth and Fourteenth Amendments. The Palos Hills Defendants now move for summary judgment, arguing that there was probable cause

to arrest Kruse and that Plaintiffs have produced no evidence of an unconstitutional policy. For the reasons set forth below, the Palos Hills Defendants' motion is granted.

**Background**[1]

**A.      Arrest of Michael Kruse**

On August 5, 2002, a man armed with a metal shank robbed Hillcrest Video in Palos Hills. (Def.'s 56.1 ¶¶ 1, 2; Pl.'s Ex. 3, at 000016.) Employee Scott Merlin ("Merlin") was the only witness to the crime. (Def.'s 56.1 ¶ 4.) The same offender again robbed the store on August 8, 2002, and again, Merlin was the victim and the only witness. (*Id.* ¶¶ 2, 6.) Palos Hills Police Detective Jeffrey Cucio investigated the first robbery, assisted by Defendant Detective John McMahon. (*Id.* ¶ 3.) McMahon took over the investigation after the second robbery. (McMahon Dep., at 42.)

---

[1]      Defendants, pursuant to Local Rule 56.1, submitted with their motion for summary judgment a statement of material facts, organized by numbered paragraphs, and supported by citations to evidence in the record including depositions and an affidavit. (Rule 56.1 Statement of Undisputed Material Facts of Defendants Village of Palos Hills and John McMahon in Support of Motion for Summary Judgment (hereinafter, "Def.'s 56.1").) *See* N.D. Ill. R. 56.1(a). Plaintiffs have apparently ignored their corresponding obligation to furnish a statement containing (1) "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon"; and (2) numbered paragraphs with "any additional facts that require the denial of summary judgment[.]" *See* N.D. Ill. R. 56.1(b)(3)(B) & (C); *F.T.C. v. Bay Area Bus. Council, Inc.,* 423 F.3d 627, 633 (7th Cir. 2005).

In their self-styled "response" to Defendants' motion for summary judgment, Plaintiffs respond only to the nine numbered paragraphs of Defendants' motion that outline Defendants' argument. (Plaintiffs' Response to Village of Palos Hills and John McMahon's Motion for Summary Judgment (hereinafter, "Pl.'s 56.1 Addnl.").) Paragraph 9 of this response is labeled "Local Rule 56.1(b) Statement of undisputed facts" and contains three sub-paragraphs with a mix of factual allegations and legal argument. Even if that paragraph is construed as a statement of additional facts, there is still no response to the forty-six numbered paragraphs in Defendants' 56.1 statement. (Pl.'s 56.1 Addnl. ¶ 9.) The "Statement of Facts" that appears in Plaintiffs' response brief, though it does contain additional factual allegations with some references to the record, does not comply with the requirements of Local Rule 56.1(b)(3). The court is therefore entitled to deem admitted the factual allegations set forth in Defendants' 56.1 statement. *See Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003) ("when a responding party's statement fails to controvert the facts as set forth in the moving party's statement in the manner dictated by [Local Rule 56.1], those facts shall be deemed admitted . . . .") Accordingly, the court for purposes of this motion considers the facts set forth by Defendants as undisputed, unless, in its independent review of the record, the court finds those facts unsubstantiated or contradicted by admissible evidence.

Merlin gave descriptions of the robber to the Palos Hills police after each robbery. Although Merlin believed that the man who committed the second robbery was the same man who had robbed the store three days earlier,[2] Merlin's descriptions varied somewhat. (Def.'s 56.1 ¶¶ 4, 7; Pl.'s 56.1 Addnl. ¶ 9.) After the first robbery, Merlin described the man as slim, unshaven, white, around 5'9" tall, with a brown shaggy mustache, a crooked nose, brown hair covering his ears, and a small straight scar on his face; the robber wore a White Sox baseball cap and a black White Sox jersey. (Def.'s 56.1 ¶ 8; Merlin Dep., at 11-12; McMahon Dep., at 24, 38-39.) After the second robbery, Merlin described the robber as between 5'11" and 6' tall, and weighing 180 pounds. (Merlin Dep., at 12-13; McMahon Dep., at 31.) Merlin also gave conflicting indications of whether the scar was on the robber's left or right cheek. (Def.'s 56.1 ¶ 8.) Bulletins issued to law enforcement agencies based on Merlin's descriptions reflected these inconsistencies. After the August 5 robbery, one bulletin described the suspect as 30 years old, 5'9", 140 to 150 pounds, with a scar on the left cheek; a second placed the scar on the right cheek and listed the age as 37. (McMahon Dep., at 38-40.) After the August 8 robbery, an Illinois State Police sketch artist interviewed Merlin and composed a sketch based on the description he provided. (Def.'s 56.1 ¶ 10.) The narrative accompanying the sketch described a white male, 5'11", 140 to 150 pounds, 35 to 40 years old; and in the sketch, the scar is on the right cheek. (Wanted Bulletin, Pl.'s Ex. 3, at 000013.)

---

[2]     In his deposition, Merlin did not explicitly testify that he believed the same man committed both robberies, but this was apparently assumed: when asked whether a sketch of the offender was prepared after the first robbery, Merlin answered that the sketch "wasn't up the second time he robbed the store." (Merlin Dep., at 10.) In an unidentified document that Plaintiffs have included in an exhibit marked "Incident Reports," an unidentified police officer who responded to the August 8 robbery recounted what Merlin reported at the scene. (Pl.'s Ex. 3, at 000020.) Merlin stated that when the robber came into the store, Merlin realized it was the same man who had committed the August 5 robbery. (*Id.*) Merlin said to the man "Not again dude, they have pictures of you from the last time you robbed me," but the robber, undeterred, told Merlin that this would "be the last time." (*Id.*) In any event, Defendants assert, and Plaintiffs do not dispute, that the same offender committed both robberies. (Def.'s 56.1 ¶ 2.)

In investigating the robberies, Detectives Cucio and McMahon obtained no evidence other than Merlin's descriptions. (McMahon Dep., at 20, 28.) Surveillance video retrieved from a nearby Wal-Mart added nothing to the investigation, (Def.'s 56.1 ¶ 5), and Hillcrest Video's surveillance equipment produced no identifiable images of the robber. (McMahon Dep., at 18, 21; Pl.'s Ex. 2.)

Shortly after the second armed robbery, Chicago Ridge Police Detective Cokete contacted Detective McMahon after overhearing one of the bulletins issued by Palos Hills police.[3] (Def.'s 56.1 ¶ 11.) Cokete told McMahon that a homeless man named Michael Kruse fit the description of the offender. (*Id.* ¶ 12; McMahon Dep., at 43-44.) Cokete was aware of Kruse because Chicago Ridge police had an outstanding warrant for Kruse's arrest on a disorderly conduct charge.[4] (Def.'s 56.1 ¶ 13.) Cokete provided McMahon with a mug shot of Kruse that had been taken by Chicago Ridge police on March 5, 2002, after an unrelated arrest on that date. (*Id.* ¶ 14; McMahon Dep., at 110-11.) McMahon obtained a listed address for Kruse in Hickory Hills, but was informed by Hickory Hills police that Kruse no longer lived there. (Def.'s 56.1 ¶ 15.) McMahon also spoke to Kruse's sister, who confirmed that Kruse was homeless. (*Id.* ¶ 16.)

Using the mug shot of Kruse from Chicago Ridge and photographs from Palos Hills police files of suspects who looked like Kruse, McMahon created an eight-photo array. (*Id.* ¶ 17; McMahon Dep., at 48-49.) McMahon showed Merlin the photo array and asked him if he recognized the robber. (Def.'s 56.1 ¶ 19.) McMahon told Merlin to take his time, and did not tell

---

[3] This appears to have taken place on August 13, 2002. An unidentified document, included in an exhibit that Plaintiffs have labeled "Exhibits to Detective McMahon's Deposition which Defense Counsel neglected to attach," contains a narrative, by an unidentified author, of Detective McMahon's actions after the August 8 robbery. (Report ID P000130208041, Rec. No. 2, Pl.'s Ex. 1.) The narrative states that on August 13, 2002, McMahon "met with Det Cholke at the Chicago Ridge Police Department regarding this case," who provided McMahon with the information now attributed to Detective Cokete. (*Id.*) The court infers that Cholke and Cokete are the same person.

[4] The Chicago Ridge warrant, a bond forfeiture warrant, had been issued on June 12, 2002. (Pl.'s Ex. 3 at 000052.)

4

him who to pick. (*Id.*) After looking at the array for less than a minute, Merlin picked the photograph of Kruse. (*Id.*) McMahon considered Merlin credible. (*Id.* ¶ 20.) McMahon maintains that Merlin told him that Merlin was "sure" that the man in the photo he picked out was the man who had robbed him. (McMahon Dep., at 52, 54.)

Plaintiffs dispute the certainty of Merlin's identification. Defendants, in their Local Rule 56.1 Statement of Undisputed Facts, state that Merlin "could not be 100 percent certain." (Def.'s 56.1 ¶ 23.) Defendants cite to a portion of Merlin's deposition testimony in which he testified that he never told McMahon that he was "a hundred percent certain" because he could not see a scar or a White Sox cap and jersey in Kruse's photograph. (Merlin Dep., at 34.) In Plaintiffs' view, this establishes that Merlin "could not make a positive identification." (Memorandum in Support of Plaintiffs' Response to the Village of Palos Hills and John McMahon's Motion for Summary Judgment (hereinafter, "Pl.'s Resp."), at 2.) Plaintiffs rely on other portions of Merlin's deposition, where he testified, "I made very clear never to say that that's the guy due to me not being sure that was the guy. . . . I couldn't be sure that's the guy[,]" (Merlin Dep., at 41); and that he "never said that I was sure it was him, because I wasn't sure it was him." (*Id.* at 19.) Merlin also testified, however, that when he picked Kruse, he told McMahon "he looks like the guy who did it. . . . that looks like him." (*Id.* at 24.) He further testified that he told McMahon that other than the absence of the scar and the White Sox clothes, the picture he identified looked "very very much like the person" who robbed him, and that if the man in the photo had a scar, the photo would be "very very accurate." (*Id.* at 26.) Merlin admits that he told McMahon the photo "looks a lot like him" and that "[w]ith the scar, it would look even more like him, possibly be him." (*Id.* at 19.)

After Merlin's identification of Kruse, McMahon called Assistant State's Attorney Pat Sheahan, told him the facts of the case, and explained that Merlin had picked Kruse out of a photo lineup. (Def.'s 56.1 ¶ 24.) Sheahan prepared a warrant for Kruse's arrest, which stated the charge of armed robbery and provided a physical description of Kruse based on Merlin's descriptions. (*Id.*;

McMahon Dep., at 66-67; Arrest Warrant, Pl.'s Ex. 3, at 000050.)  On August 15, 2002, Judge James P. O'Malley signed the warrant after McMahon swore to the truth of the facts in support of issuance of the warrant, and told Judge O'Malley that Merlin had made a positive identification of Kruse from a photo array.  (Def.'s 56.1 ¶ 24; Answer to Third Am. Compl. ¶ 20; McMahon Dep., at 65-66; Arrest Warrant, Pl.'s Ex. 3, at 000050.)

On May 15, 2004—nearly two years later—the Bridgeview Police Department arrested Kruse.  (Def.'s 56.1 ¶ 25.)  Although the record does not reveal the precise circumstances of that arrest, it is Detective McMahon's understanding that police had found Kruse intoxicated in a Bridgeview park.  (McMahon Dep., at 111.)  When they ran a check for outstanding warrants, Bridgeview police found both the warrant for the Palos Hills armed robbery, and the warrant for disorderly conduct from Chicago Ridge.  (Def.'s 56.1 ¶¶ 13, 26; McMahon Dep., at 112.) Bridgeview police contacted Palos Hills police, who picked Kruse up from Bridgeview at 6:40 p.m. on May 15, 2004—a Saturday—and brought him to the Palos Hills lockup where he was fingerprinted and photographed.[5]  (Def.'s 56.1 ¶ 28; McMahon Dep., at 76-77.)  When he was arrested, Kruse did not have a scar on his face.  (Def.'s 56.1 ¶ 23.)  He was 43 years old.  (State of Illinois Driver's License, Michael D. Kruse, Pl.'s Ex. 6.)  His booking mug shot on May 15, 2004 lists him as 6 feet tall and 170 lbs.  (DocuBOOK Mugshots, Pl.'s Ex. 1.)

---

[5]        The parties offer different characterizations of Kruse's arrest. Defendants assert that Kruse was "actually arrested and detained based on both outstanding warrants" in Bridgeview. (Def.'s 56.1 ¶ 27.) Plaintiffs assert that Bridgeview police arrested Kruse only on the Chicago Ridge disorderly conduct warrant, and that Kruse was not arrested on the armed robbery warrant until Palos Hills police fingerprinted and photographed him. (Pl.'s 56.1 Addnl. ¶ 2; Pl.'s Resp., at 3, 9.) For purposes of the armed robbery warrant, Plaintiffs maintain, Kruse was not "arrested" by Bridgeview police, but merely "taken into custody" and "detained." (Pl.'s Resp., at 3, 9.) The only evidence Plaintiffs cite to in support of these assertions, however, is portions of McMahon's deposition testimony in which he states that Bridgeview police "arrested" Kruse, (McMahon Dep., at 73, 75), and that "he was arrested and detained based on two warrants." (Id. at 112.) The evidence thus supports Defendants' assertion that Bridgeview police arrested Kruse on both warrants.  The record does not appear to contain any evidence to support Plaintiffs' version.

The court further discusses the implications of this dispute *infra*, in the court's analysis of whether there was probable cause for Kruse's arrest.

Detective McMahon was notified of Kruse's arrest late Saturday night, and interviewed Kruse at 8:40 a.m. the following morning. (Def.'s 56.1 ¶ 29; McMahon Dep., at 78-80.) Kruse told McMahon that at the time of the Hillcrest Video robberies, he had been working at Perdue Chicken in Tennessee. (Def.'s 56.1 ¶ 29.) Defendants assert that after Kruse offered his alibi on Sunday morning, May 16, 2004, McMahon "immediately followed up." (*Id.*) In fact, however, although McMahon testified that he "[i]mmediately . . . made efforts to get ahold of the bosses, administration, whoever at Perdue Chicken and find out if we could get this story verified," he acknowledged that he did not actually contact anyone at Perdue Chicken in Tennessee until Tuesday, May 18, 2004. (*Id.* ¶ 31; McMahon Dep., at 93.) In the meantime, at a bond hearing on Monday, May 17, 2004, Assistant State's Attorney Lisa Smith learned that Kruse had told his public defender that he had been out of state at the time of the robberies. (McMahon Dep., at 89-91.) On May 18, Smith contacted Palos Hills police with this information. (*Id.* at 91-92.) McMahon called Assistant State's Attorney Battaglia, who advised McMahon to check Kruse's story. (*Id.* at 93.) Only then did McMahon began placing calls to the Perdue Chicken Human Resources Department. (*Id.*)

By this time, Kruse had been transferred to Cook County Jail. (*Id.* at 86.) Although the parties do not specify exactly when Cook County assumed custody, it appears to be after Kruse's bond hearing on May 17, 2004.[6] (*Id.* at 89.) According to McMahon, Palos Hills has an unwritten policy of encouraging expeditious transfers of prisoners to Cook County. (*Id.* at 87.) McMahon explained that Palos Hills police, for "safety [and] liability" reasons, "don't like to hold onto prisoners unless we have to due to the fact of suicides, whatever." (*Id.*)

On May 20, 2004, Steve Cannon from Perdue Chicken faxed documents to McMahon,

---

[6] According to Palos Hills police logs, Kruse was released on May 17, 2004, at 7:29 a.m. and taken to circuit court for the bond hearing. (Prisoner Log Sheet, Pl.'s Ex. 7.) McMahon testified that "at his bond hearing" Kruse was "turned over to the Cook County Jail." (McMahon Dep., at 89.)

including time cards with Michael Kruse's name and Social Security number, that appeared to confirm Kruse's alibi that he was working at Perdue Chicken at the time of the robberies. (Def.'s 56.1 ¶ 31; McMahon Dep., at 98-99.) McMahon, however, did not consider the alibi foolproof because an employee ID photograph that was included in the fax "came out solid black." (Def.'s 56.1 ¶ 31; McMahon Dep., at 98-100.) Because he was not "100 percent sure" of Kruse's alibi,[7] and because he believed that Kruse's public defender was "right behind me in my investigation," McMahon did not inform the State's Attorney or the public defender's office of what he had received from Cannon. (McMahon Dep., at 102-03.) Instead, McMahon asked Cannon to mail the photograph and time sheets, which McMahon received via Federal Express on June 3, 2004.[8] (*Id.* at 100.) Unbeknownst to McMahon, Kruse had died from a ruptured aorta in the Cook County Jail on May 26, 2004, (Def.'s 56.1 ¶ 32; Answer to Third Am. Compl. ¶ 26), where Plaintiffs assert that Cook County Sheriff's deputies and medical staff had ignored Kruse's complaints of pain and pleas for assistance. (Fifth Am. Compl. ¶¶ 32-38.) Upon learning of Kruse's death, McMahon closed his investigation of Kruse; he now believes that Kruse was not the man who committed the August 2002 armed robberies. (McMahon Dep., at 105.)

---

[7]    McMahon testified that to satisfy concerns about identity theft, he "had to put the picture to the ID card." (McMahon Dep., at 98.) Although he considered the May 20, 2004 documents "strong" evidence that Kruse was not the offender in the August 2002 robberies, he was not "positive": "You can't just let somebody go and say he is innocent until you prove it 100 percent." (*Id.* at 99.)

[8]    The record does not reveal whether the photographs McMahon received from Perdue Chicken were indeed of Kruse. McMahon testified only that he received the Federal Express package with "the photographs," without stating whether the employee ID photographs were of Kruse or confirmed Kruse's alibi to McMahon's satisfaction. (McMahon Dep., at 100.) Plaintiffs have submitted a page containing photocopies of eight different photographs, presumably of Kruse, (Pl.'s Ex. 3, at 000010), but have failed to provide any identifying or descriptive information to accompany these photographs. Nonetheless, the court infers, from the fact that McMahon now believes that Kruse did not commit the robberies, (McMahon Dep., at 105), that the Perdue Chicken employee ID photo was in fact of Kruse.

## B.  Palos Hills Police Official Policies

The Detective Division of the Palos Hills Police Department is comprised of a Detective Sergeant and two Detectives.  (Def.'s 56.1 ¶ 33.)  All three members of the Detective Division have received state-mandated training on making proper arrests and conducting on-scene police investigations.  (*Id.* ¶ 35.)  In addition, the Village requires its Detectives to undergo supplemental training, and all three members of the Detective Division, including Defendant McMahon, have received training on topics specifically relating to conducting proper investigations and making proper arrests.  (*Id.* ¶¶ 36-38.)  All Detectives, "as a matter of strictly enforced policy and custom," must follow up on all leads and alibis during a felony investigation.  (*Id.* ¶ 39.)  All members of the Palos Hills Police Department must analyze all the evidence presented to them before attempting to obtain an arrest warrant, and, before obtaining an arrest warrant on a felony, must confer with an Assistant State's Attorney as to whether the evidence justifies obtaining a warrant.  (*Id.* ¶ 40-41.)  When provided with the evidence, the Assistant State's Attorney conducts a felony review to determine whether to obtain an arrest warrant.  (*Id.* ¶ 42.)

Members of the Palos Hills Police Department may not seek to obtain an arrest warrant based on a tentative identification.  (*Id.* ¶ 43.)  Defendants assert that Detective McMahon has "never gone to a judge" or "attempted to obtain an arrest warrant on anything less than 100 percent identification."[9]  (*Id.* ¶ 44.)

The Village also enforces a policy by which all information uncovered during a felony investigation must be forwarded to the State's Attorney's Office.  (*Id.* ¶ 45.)  It is the custom and practice for Palos Hills police to prepare reports of all police investigations and maintain all documentary evidence.  (*Id.* ¶¶ 45-46.)

---

[9]      The court notes that this assertion is inconsistent with Defendants' acknowledgment that Merlin "could not be 100% certain" of his identification of Kruse from the photo array.  (Def.'s 56.1 ¶ 23.)  By Defendants' own admission, Detective McMahon sought a warrant at least once based on "less than 100 percent identification."  (*Id.* ¶ 44.)

## C.    This Lawsuit

Plaintiff Kathy Kruse, as administrator of Michael Kruse's estate, initiated this lawsuit on September 21, 2004.   Kathy Kruse, along with Plaintiffs Porsha Cayenne Kruse and Michael Joseph Kruse, who Plaintiffs allege are minors and surviving children of Michael Kruse, (Fifth Am. Compl. ¶¶ 5-6), brought claims under 42 U.S.C. § 1983; a state law claim for negligence/wrongful death; and a survival action.  Plaintiffs initially named as defendants Cook County Sheriff Michael Sheahan, Cook County Jail Director Callie L. Baird, and several known and unknown Deputy Cook County Sheriffs.  On April 21, 2005, this court granted Defendants' motion to dismiss § 1983 claims against Sheahan and Baird.  *Kruse v. Sheahan*, No. 04 C 6130, 2005 WL 1126549, at *2 (N.D. Ill Apr. 21, 2005).  Plaintiffs' Second and Third Amended Complaints, filed on May 13, 2005, and July 5, 2005, added as defendants the County of Cook and a nurse employed by the County, and further added § 1983 claims against the Village,[10] Palos Hills Chief of Police Paul Madigan, Detective McMahon, and "Richard Roe 3" (whom Defendants later identified as Detective Cucio). (Third Am. Compl. ¶¶ 51-63.)   The Village, McMahon, and Cucio answered Plaintiffs' Third Amended Complaint on July 22, 2005.   On September 9, 2005, this court granted Police Chief Madigan's motion to dismiss the claims against him and denied the Cook County Defendants' motion to dismiss.  Order 9/9/05.  On April 28, 2006, McMahon and the Village moved for summary judgment on Plaintiffs' § 1983 claims.  Plaintiffs' Fifth Amended Complaint, filed on August 14, 2006, re-pleads § 1983 claims against McMahon and the Village, as well as against the Cook County Defendants, but brings no claims against Detective Cucio.  (Fifth Am. Compl. ¶¶ 56-71.)

---

[10]        The parties dispute the correct name of the municipality.  Defendants prefer "Village of Palos Hills," and assert, without explanation, that it is "incorrectly sued as 'the City of Palos Hills.'" (Def.'s 56.1, at 1.)  The municipality's web site, however, identifies the "City of Palos Hills", *see* http://www.paloshillsweb.org/, as does the web site for the Palos Hills police department, *see* http://www.paloshillspolice.us/.  Nonetheless, for purposes of Defendants' motion, the court accepts Defendants' "Village" appellation; in any event, all of the court's references to "the Village" refer to the municipality of Palos Hills, Illinois.

Allegations previously brought against "Richard Roe 3" are brought against McMahon in the Fifth Amended Complaint.

Count IV of the Fifth Amended Complaint asserts § 1983 claims against McMahon and against the Village, alleging violations of the Fourth and Fourteenth Amendments. Plaintiffs assert that Kruse was "never positively identified" and that the only evidence linking Kruse to the armed robbery was a "tentative identification from a photo array." (Fifth Am. Compl. ¶ 56.) Plaintiffs allege that McMahon committed the torts of false arrest and imprisonment, and deprived Kruse of his due process rights and the right to be free from unreasonable search and seizure by (1) falsely representing that he had a positive identification when obtaining Kruse's arrest warrant for armed robbery; (2) failing to take additional identification steps once Kruse was arrested, such as an in-person lineup, to ensure that Kruse was the offender; and (3) failing to promptly investigate and verify Kruse's alibi. (*Id.* ¶¶ 57, 58, 62, 63, 70.) As to the Village, Plaintiffs assert that the Village maintains a policy or custom that allows its police officers to seek arrest warrants based on "tentative identifications" and "perfunctory investigations," and that the Village's custom or policy "to not require that the identification and alibi of an individual be checked" once a person is in custody caused Kruse to "remain wrongfully" in Village custody. (*Id.* ¶¶ 59, 67.) In the alternative, Plaintiffs contend that even if the Village maintained policies or customs mandating prompt verification of alibis and identification, McMahon was "grossly negligent and/or reckless and willful and wanton in his failure to do so." (*Id.* ¶ 61.)

In this motion, Defendants argue that the Village is entitled to summary judgment on Plaintiffs' § 1983 claims because Plaintiffs have presented no evidence of any unconstitutional custom or policy. (Memorandum of Defendants the Village of Palos Hills and John McMahon in Support of Their Motion for Summary Judgment (hereinafter, "Def.'s Mem."), at 7-8.) As to McMahon, Defendants contend that the armed robbery arrest warrant was supported by probable cause; that there is no evidence that McMahon falsified information to obtain the warrant; that

Kruse's seizure and detention was proper in any event due to the existence of the second, disorderly conduct warrant; and that Kruse's continued detention did not violate his due process rights because McMahon had no duty to investigate further when the seizure was supported by probable cause. (*Id.* at 10-11, 13.) In the alternative, Defendants argue that McMahon is entitled to qualified immunity. (*Id.* at 14.)

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When considering a motion for summary judgment, a court may not assess the credibility of witnesses, choose between competing inferences, or balance the relative weight of conflicting evidence. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The court views all the evidence in the record in the light most favorable to the non-moving party and resolves all factual disputes in favor of the non-moving party. *Id.*

### II. Section 1983 Claims Against the Village

A plaintiff bringing claims under § 1983 must show (1) a deprivation of a right secured by the Constitution or laws of the United States, and (2) that the deprivation was visited upon the plaintiff by a person or persons acting under color of state law. *McKinney v. Duplain*, 463 F.3d 679, 683 (7th Cir. 2006) (citing *Jones v. Wilhelm*, 425 F.3d 455, 465 (7th Cir. 2005). A municipality may not be held liable under § 1983, on a theory of *respondeat superior*, for the constitutional violations of its agents and employees. *Monell v. Department of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-91 (1978). Rather, liability attaches to the municipality only when its officers inflict constitutional injury in the execution of a municipality's official policy or custom. *Sornberger v. City*

12

*of Knoxville, Ill.*, 434 F.3d 1006, 1029 (7th Cir. 2006) (citing *Monell*, 436 U.S. at 694). A plaintiff

must show a "direct causal link between the municipal policy and the constitutional deprivation."

*Arlotta v. Bradley Center*, 349 F.3d 517, 522 (7th Cir. 2003) (quoting *McNabola v. Chicago Transit*

*Auth.*, 10 F.3d 501, 510 (7th Cir. 1993)). In other words, the policy or custom must be the "moving

force" behind the alleged constitutional injury. *Id.* (citing *Gable v. City of Chicago*, 296 F.3d 531,

537 (7th Cir. 2002)).

In the Fifth Amended Complaint, Plaintiffs assert that the Village maintains an

unconstitutional policy or custom of performing perfunctory investigations, obtaining arrest warrants

on tentative identifications, and failing to investigate or verify alibis. (Fifth Am. Compl. ¶¶ 59, 67.)

Responding to Defendants' motion for summary judgment, however, Plaintiffs abandon those

allegations in favor of attacking two other alleged customs or policies: first, the Village's policy of

transferring prisoners to Cook County Jail "as soon as possible," which Plaintiffs contend

"discourages police officers from conducting meaningful investigations where there is a lack of

probable cause to make an arrest"; and second, the fact that the Village does not utilize "skip trace"

technology,[11] which Plaintiffs maintain would have allowed McMahon to determine where Kruse was

living in August 2002 when the robberies took place. (Pl.'s Resp., at 13-15.) Plaintiffs have not

asserted or referred to these two allegations in any of their pleadings. Defendants argue that

Plaintiffs have produced no evidence that any of the alleged policies are unconstitutional, and that

Plaintiffs have in any event failed to show that the practice of quickly transferring detainees to Cook

County Jail resulted in Kruse's allegedly improper arrest and detention. (Reply of Village of Palos

Hills and John McMahon in Support of Their Motion for Summary Judgment (hereinafter, "Def.'s

Reply"), at 2.)

---

[11]    A "skip trace" is a method of finding a person by using his or her social security
number to obtain a credit history, which in turn can provide other information such as date of birth
and current employment. *See* http://www.inet-investigation.com/skip-tracing/skip-trace.htm.

With regard to the allegations in the Fifth Amended Complaint that the Village maintains policies or customs of performing perfunctory investigations, obtaining arrest warrants on tentative identifications, and failing to investigate or verify alibis, Plaintiffs have offered no evidence that the Village maintains such policies or customs. Citing to the affidavit of Palos Hills Chief of Police Madigan, the Village asserts that it requires its officers, "as a matter of strictly enforced policy and custom," to "thoroughly" investigate and follow up on "all leads and alibis during a felony investigation," and, before obtaining an arrest warrant, "analyze all the evidence presented to them" and confer with an Assistant State's Attorney as to whether the evidence justifies a warrant. (Def.'s 56.1 ¶¶ 39-41; Madigan Aff. ¶¶ 10-12, Ex. 3 to Def.'s 56.1.) The Village further asserts that it maintains a policy that "a request for an arrest warrant . . . cannot be based on a tentative identification" and that its officers "must not seek a warrant that is based on a tentative identification." (Def.'s 56.1 ¶ 43; Madigan Aff. ¶ 14.) Plaintiffs produce no evidence to counter Madigan's affidavit, and indeed present no argument in support of the allegations contained in the Fifth Amended Complaint in their response to Defendants' motion for summary judgment. These allegations thus cannot survive summary judgment. *See Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005) (in responding to a motion for summary judgment, the non-moving party "who bears the burden of proof on a particular issue may not rest on its pleading"); *Johnson v. Doughty*, 433 F.3d 1001, 1009-10 (7th Cir. 2006) ("'The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [non-moving party].'") (quoting *Anderson*, 477 U.S. at 252).

Plaintiffs nevertheless contend that the Village's policy of quickly transferring prisoners to Cook County Jail is unconstitutional in that "it encourages police officers to quickly transfer detainees arrested without probable cause to the Cook County Jail before a reasonable investigation can take place[,]" (Pl.'s Resp., at 14), and therefore "discourages police officers from

14

conducting meaningful investigations where there is a lack of probable cause . . . ." (*Id.* at 13.) As the court understands Plaintiffs' argument, Plaintiffs contend that the transfer policy either encourages Palos Hills Police to make arrests without probable cause, or discourages police from developing probable cause if an individual has been arrested without probable cause. Either way, Plaintiffs attempt to tie the transfer policy to a Fourth Amendment violation of arrest without probable cause.[12]  The court is not persuaded.

To survive summary judgment, Plaintiffs must show a "direct causal link" between the transfer policy and the alleged constitutional deprivation. *See Arlotta*, 349 F.3d at 522. Plaintiffs thus must present evidence showing that the Village's practice of transferring prisoners to Cook County Jail soon after their arrest was the "moving force" behind McMahon's allegedly arresting Kruse without probable cause. *See id.* Plaintiffs have failed to establish this causal link. Their argument depends on accepting the inference that a practice of transferring prisoners after they have been arrested somehow gives officers a green light to arrest suspects without probable cause. This inference is untenable. A quick transfer of a detainee does not, in the court's view, amount to an endorsement of an inadequate investigation or unconstitutional arrest. If a suspect is arrested without probable cause, a constitutional violation has occurred; the arresting officer does not escape responsibility if the suspect is then transferred to another lockup. The incentive to arrest a suspect without probable cause, upon which Plaintiffs' argument relies, is thus entirely absent. As a general matter, therefore, the court cannot accept Plaintiffs' theory that the quality of a police investigation bears some relation to the location of suspect's detention after arrest. Accordingly, Plaintiffs have not established the requisite "direct causal link," and the court concludes that no

_____

[12]     Plaintiffs do not assert that the Village's transfer policy, in itself, violates the Eighth Amendment's prohibition on cruel and unusual punishment. Although Plaintiffs bring an Eighth Amendment claim against the Cook County Defendants arising from the circumstances of Kruse's death in Cook County Jail, (Fifth Am. Compl. ¶ 42), Plaintiffs do not bring that claim against the Palos Hills Defendants, or attempt to link any Village policy with that alleged constitutional violation.

reasonable jury could find that the Village transfer policy was the "moving force" behind Kruse's allegedly unconstitutional arrest without probable cause.[13]

The court also finds no merit to Plaintiffs' argument that the Village's alleged lack of "technology to conduct a simple skip trace"[14] constitutes an unconstitutional practice. Plaintiffs contend that had McMahon run a skip trace on Kruse before seeking the warrant for his arrest in August 2002, he would have learned "where Kruse was living in August 2002" rather than conclude that Kruse was homeless. (Pl.'s Resp., at 14; McMahon Dep., at 68-69.) Plaintiffs do not, however, cite to or produce any evidence to support this assertion. The portion of McMahon's deposition testimony on the subject of a skip trace establishes only that Palos Hills Police did not have the capability to run a skip trace in August 2002, and that he did not run one. (McMahon Dep., at 69-70.) McMahon does not testify as to what a skip trace would have revealed; nor does the record contain any other evidence relating to skip tracing. Plaintiffs thus present no competent evidence demonstrating how a skip trace would have aided McMahon's investigation.

Even if the court were to accept Plaintiffs' assertion that a skip trace would have alerted

---

[13]    Plaintiffs maintain, without elaboration, that *Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006) "support[s] their position" on the issue of "[w]hether the Village of Palos Hills maintained an unconstitutional policy in connection with post-arrest investigation of alibis." (Motion of the Plaintiffs to Provide Additional Authority in Support of Their Response to Defendants Palos Hills and John McMahon's Motion for Summary Judgment, at 1-2.) This court does not see the relevance of *Davis* to this issue. The plaintiff in *Davis* brought § 1983 claims under the Eighth Amendment against Cook County and several of its employees, arising from the defendants' alleged failure to provide methadone to the plaintiff's decedent during his six-day incarceration in Cook County Jail. 452 F.3d at 687, 691. Reversing a grant of summary judgment for the defendants, the court held that there was a disputed issue of material fact as to whether Cook County had a widespread practice of untimely methadone treatment, and as to whether certain of the individual defendants acted with the requisite "deliberately indifferent" state of mind. *Id.* at 692, 695-96. The decision contains no discussion of arrest, probable cause, or investigation of alibis. Whatever significance *Davis* may have as to Plaintiffs' Eighth Amendment claims against the Cook County Defendants in this case, it has no relevance to the Palos Hills Defendants, or to the Fourth Amendment issues Plaintiffs have advanced here.

[14]    Plaintiffs do not provide the court with any information about skip tracing; nor do they indicate what particular "technology" is required to conduct a skip trace.

McMahon to Kruse's whereabouts in August 2002, and therefore cast doubt on his involvement in the Hillcrest Video robberies, Plaintiffs fail to demonstrate how the lack of a skip trace was the "moving force" behind any constitutional violation. Indeed, Plaintiffs do not identify which particular constitutional right was allegedly violated. Plaintiffs cite no authority, and the court is aware of none, suggesting that either due process or the Fourth Amendment requires police officers to utilize every available technological tool when conducting a criminal investigation. Furthermore, even assuming constitutional injury, the Village's lack of "technology to conduct a simple skip trace," amounts, at most, to negligence. It is well-established that "[s]ection 1983 claims cannot be founded on negligence." *Loubser v. Thacker*, 440 F.3d 439, 442 (7th Cir. 2006) (citing *Daniels v. Williams*, 474 U.S. 327, 330 (1986)); *Lewis v. Anderson*, 308 F.3d 768, 773 (7th Cir. 2002) ("Negligence or even gross negligence does not suffice to give rise to liability under § 1983.").

The court therefore grants summary judgment in favor of the Village on Plaintiffs' § 1983 claims.

III.     **Section 1983 Claims Against McMahon**

Plaintiffs allege that McMahon violated Kruse's constitutional rights by arresting and detaining him without probable cause. Plaintiffs argue that the facts show that Merlin made only a tentative identification when he picked Kruse out of the photo array, but that McMahon falsely represented that Merlin had made a positive identification when he obtained the warrant for Kruse's arrest. (Pl.'s Resp., at 5-8.) Plaintiffs further argue that once he had arrested Kruse without probable cause, McMahon should have taken "steps to develop probable cause" by promptly investigating Kruse's alibi and by running an in-person lineup for Merlin to view. (*Id.* at 10.) Defendants maintain that Village police, independent of the armed robbery warrant, had probable cause to seize and detain Kruse due to the second outstanding warrant for disorderly conduct from Chicago Ridge; that probable cause existed in any event when McMahon sought the armed robbery warrant; and that McMahon was not constitutionally obligated to continue investigating after Kruse's

arrest. (Def.'s Reply, at 3-9.) McMahon alternatively raises the defense of qualified immunity. The court addresses these issues in turn.

### A.  Probable Cause for Kruse's Arrest

#### 1.  Probable Cause Based on The Disorderly Conduct Warrant

Defendants argue that the existence of the second outstanding warrant for Kruse's arrest, on disorderly conduct charges originating from Chicago Ridge, provided an independent basis for probable cause that justified Kruse's arrest. (Def.'s Mem., at 10.) Plaintiffs maintain that the second warrant "has no bearing on this case" because Palos Hills police never actually arrested Kruse on the disorderly conduct charge. (Pl.'s Resp., at 9.) Because the Village executed only the armed robbery warrant, Plaintiffs contend, insufficiency in that warrant precludes any finding that probable cause existed for Kruse's arrest. (*Id.*) The court agrees with Defendants that the Chicago Ridge warrant, independent of the Palos Hills armed robbery warrant, supports probable cause.

Probable cause to arrest is an absolute defense to any § 1983 claim against police officers for wrongful arrest, false imprisonment, or malicious prosecution. *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006) (citing *Potts v. City of Lafayette*, 121 F.3d 1106, 1113 (7th Cir. 1997)). Probable cause exists if the facts and circumstances within an officer's knowledge would warrant a prudent person in believing that the suspect had committed an offense. *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001) (citations omitted); *see Beck v. Ohio*, 379 U.S. 89, 91 (1964). Where an individual is arrested pursuant to a warrant that later turns out to be invalid, other circumstances within the officer's knowledge at the time of the seizure can be sufficient to warrant that belief and thus support probable cause. *See Hernandez v. Sheahan*, 455 F.3d 772, 774 (7th Cir. 2006) (observing that even if the plaintiff in a § 1983 case was not the person named in the warrant pursuant to which he was arrested, his seizure and initial custody were appropriate because he had committed three traffic offenses when the police stopped him).

An outstanding arrest warrant is one such circumstance. It is well-settled that the existence

of an outstanding warrant supports probable cause for an arrest. *See United States v. Thornton*, 463 F.3d 693, 698 (7th Cir. 2006); *Case v. Kitsap County Sheriff's Dept.*, 249 F.3d 921, 928 (9th Cir. 2001) (noting the "long line of cases from this and other circuits" in which a "hit" on a warrants check in a national database "'has been routinely accepted in establishing probable cause for a valid arrest'") (quoting *United States v. Hines*, 564 F.2d 925, 927 (10th Cir. 1977)). In *Thornton*, for example, the Seventh Circuit held that a valid investigatory stop "did not turn into an arrest without probable cause" where the police officers, during the stop, obtained the defendant's name and birth date, ran a warrant check, and discovered that the defendant had an outstanding warrant for felony domestic battery. 463 F.3d at 696, 698. The court held that probable cause existed for the subsequent arrest as soon as the officers learned of the outstanding warrant: "That information supports probable cause for the arrest whether or not it was correct." *Id.* at 698; *see also United States v. Ellison*, 462 F.3d 557, 563 (6th Cir. 2006) (police officer, after observing van idling in a no-parking zone and running a check on the license plate, had probable cause to arrest driver when the check revealed that the van's registered owner had an outstanding felony warrant).

Here, in an effort to avoid the significance of the Chicago Ridge disorderly conduct warrant, Plaintiffs engage in a tortured characterization of the manner in which Palos Hills police obtained custody of Kruse after his initial seizure by Bridgeview police. According to Plaintiffs, Bridgeview police arrested Kruse on the Chicago Ridge disorderly conduct warrant, and only on that warrant. (Pl.'s Resp., at 3, 9.) Plaintiffs explicitly disclaim any challenge to that arrest or to the disorderly conduct charge. (*Id.* at 9.) Kruse was not "arrested" by Bridgeview police on the armed robbery warrant, Plaintiffs maintain, but was merely "taken into custody" and "detained" on that warrant. (*Id.* at 3, 9.) Kruse was not actually arrested on the armed robbery warrant, according to Plaintiffs, until Palos Hills police fingerprinted and photographed him. (*Id.*; Pl.'s 56.1 Addnl. ¶ 2.)

The court declines to adopt this version of events, which finds no support in the record. Defendants assert that Kruse was "actually arrested and detained based on both outstanding

warrants" in Bridgeview. (Def.'s 56.1 ¶ 27.) Plaintiffs, to support their contention that Bridgeview police arrested Kruse only on the disorderly conduct warrant, and merely "detained" him for purposes of the armed robbery warrant, cite to portions of McMahon's testimony that actually support Defendants' assertion: McMahon testified that Bridgeview police "arrested" Kruse, (McMahon Dep., at 73, 75), and that "he was arrested and detained based on two warrants." (*Id.* at 112.) Moreover, although the record does not reveal precisely how Kruse came to the attention of Bridgeview police in the first place, Detective McMahon testified that it was his understanding that Bridgeview police arrested Kruse upon finding him intoxicated in a public park, (*id.* at 111), and Plaintiffs produce no evidence that suggests otherwise. After that initial seizure, a warrants check revealed both the Palos Hills armed robbery warrant and the Chicago Ridge disorderly conduct warrant. (*Id.* at 112; Def.'s 56.1 ¶¶ 13, 26.) Bridgeview police then notified Palos Hills police—presumably because armed robbery is a far more serious charge than disorderly conduct—and Palos Hills police picked up Kruse from Bridgeview and brought him to the Palos Hills lockup where he was fingerprinted and photographed. (Def.'s 56.1 ¶ 28; McMahon Dep., at 76-77.) There is thus no evidence in the record to support Plaintiffs' assertion that Bridgeview police arrested Kruse only on the disorderly conduct warrant, but not on the armed robbery warrant, and that Kruse was separately arrested on the armed robbery warrant by Palos Hills police only upon being processed there.

More significantly, Plaintiffs cite to no authority supporting the proposition that an individual cannot be deemed to have been "arrested" until he has been fingerprinted and photographed; nor do Plaintiffs cite to any authority supporting, or explaining, any purported distinction between being "detained" or "taken into custody" and being "arrested." The court is aware of no such distinction. The application of the Fourth Amendment, pursuant to which Plaintiffs bring their claims, hinges on "seizure," not "arrest." *See Dunaway v. New York*, 442 U.S. 200, 212 (1979). A person is "seized" when, "in view of all of the circumstances surrounding the incident, a reasonable person would have

believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). Even if Kruse was not fingerprinted and photographed until he arrived at the Palos Hills lockup, it is undisputed that he was "seized" from the moment he was taken into custody in Bridgeview, and he cannot have been "seized" for purposes of one warrant but not the other. It is irrelevant under which charge Kruse was arrested, or where he was eventually fingerprinted and photographed, so long as there was probable cause for the seizure. Plaintiffs' admission that Kruse's seizure by Bridgeview police was valid would, therefore, appear to entirely remove any Fourth Amendment concerns.

Even if the court were to accept Plaintiffs' contention that Bridgeview police did not actually arrest Kruse on the armed robbery warrant—a contention for which, as noted, Plaintiffs have failed to produce evidence to counter Defendants' assertion that he was arrested on *both* warrants—and even if Kruse had, somehow, not yet been "seized" before Palos Hills police arrived in Bridgeview to pick him up, the existence of the disorderly conduct warrant would have provided probable cause for Palos Hills police to seize him at that time. Illinois law allows any "peace officer" to arrest an individual, anywhere in Illinois, when the officer has a warrant or reasonable grounds for believing there is a warrant. *See* 725 ILL. COMP. STAT. 5/107-2, -9(e). More importantly, as noted, the existence of an outstanding warrant supports probable cause for an arrest. *See Thornton*, 463 F.3d at 698; *Case*, 249 F.3d at 928. When Palos Hills police picked up Kruse in Bridgeview, they were aware of both outstanding warrants. Thus, even if the armed robbery warrant issued by Judge O'Malley was invalid for lack of probable cause, the existence of the Chicago Ridge warrant provided probable cause for Palos Hills police—or indeed any police department in Illinois—to seize Kruse. Either outstanding warrant could provide an independent basis for probable cause; if the armed robbery warrant was invalid, the valid Chicago Ridge warrant could suffice. *See Hernandez*, 455 F.3d at 774 (even though arrest warrant later proved invalid, arrest was proper because traffic violations provided independent basis for probable cause); *Thornton*, 463 F.3d at 698 (probable

cause existed as soon as officers were told of outstanding warrant, whether or not that information was correct).

Indeed, had there been no armed robbery warrant at all, Palos Hills police—or Bridgeview police, Chicago Ridge police, or any police officer in Illinois who was aware of the existence of the Chicago Ridge warrant—would have had probable cause to seize Kruse. He would have been detained as well, as the Chicago Ridge warrant was a bond forfeiture warrant for which bail would have been unavailable. Thus, even if the armed robbery warrant was as faulty as Plaintiffs contend, Kruse's seizure and subsequent detention in Palos Hills did not run afoul of the Fourth Amendment.

### 2.    Probable Cause Based on the Armed Robbery Warrant

Defendants have argued that McMahon had probable cause to arrest Kruse on the armed robbery warrant. Because the court has concluded that the Chicago Ridge warrant provides a valid basis for Kruse's arrest, it need not reach this issue. The parties have devoted significant attention to it, however, and the court will review their arguments here in some detail.

Where an arrest is made pursuant to a facially valid warrant issued by a judicial officer, probable cause is determined in light of the information available to the police officer at the time the officer sought the warrant. *Beauchamp v. City of Noblesville*, 320 F.3d 733, 742 (7th Cir. 2003) (citing *Malley v. Briggs*, 475 U.S. 335 (1986)). The court examines only what the officer knew at the time he sought the warrant, not how things turned out in hindsight. *Id.* at 743 (citing *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994)). Thus, an arrest pursuant to a warrant supported by probable cause is valid even if events later prove the charges inaccurate. *Olson v. Tyler*, 825 F.2d 1116, 1117 (7th Cir. 1987). "While the existence of probable cause is often a jury question, summary judgment is appropriate when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999) (citations omitted). Summary judgment is inappropriate, however, where a factual dispute exists such that one version of the facts would support a finding of probable cause and

another would not. *See Morfin v. City of East Chicago*, 349 F.3d 989, 1000 (7th Cir. 2003); *see, e.g., Marrero v. Landerman*, No. 03 C 1587, 2004 WL 2064893, at *7 (N.D. Ill. Sept. 2, 2004) ("Because plaintiff has successfully challenged [the defendant police officer's] description of the facts and presented a factual account from which a reasonable jury could decide that probable cause for his arrest was lacking, defendants' motion for summary judgment must be denied.").

Probable cause "demands even less than 'probability.'" *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) (quoting *United States v. Moore*, 215 F.3d 681, 685 (7th Cir. 2000)). It "requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Id.* (citation omitted). A court must evaluate probable cause "'not on the facts as an omniscient observer would perceive them,' but rather 'as they would have appeared to a reasonable person in the position of the arresting officer.'" *Mustafa*, 442 F.3d at 547 (quoting *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998)).

The Seventh Circuit has repeatedly held that "an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause." *Woods*, 234 F.3d at 996; *see, e.g., Tangwall v. Stuckey*, 135 F.3d 510, 520 (7th Cir. 1998); *Gramenos v. Jewel Co., Inc.*, 797 F.2d 432, 439 (7th Cir. 1986). When crediting such an identification, "police are under no constitutional obligation to exclude all suggestions that the witness or victim is not telling the truth." *Beauchamp*, 320 F.3d at 743 (citing *Spiegel v. Cortese*, 196 F.3d 717, 724-25 (7th Cir. 2000)); *Gramenos*, 797 F.2d at 442. Police are under no duty to further investigate unless the victim's complaint would lead a reasonable officer to be suspicious, *Beauchamp*, 320 F.3d at 743, such as where the police know that the witness harbors a grudge against the accused, *Askew v. City of Chicago*, 440 F.3d 894, 895 (7th Cir. 2006). *See United States v. Decoteau*, 932 F.2d 1205, 1207 (7th Cir. 1991) ("If it seems reasonable to the police to believe that the eyewitness was telling the truth, they need not take any additional steps to corroborate the information regarding the crime

before taking action.")  Moreover, an identification by a witness or a victim is sufficient to establish probable cause even where there are discrepancies between the witness's description and the suspect's appearance when arrested.  *Tangwall*, 135 F.3d at 516.

Plaintiffs argue that Merlin's identification did not meet even this generous test because all Merlin was able to do was to choose Kruse's photograph from the photo array McMahon prepared.[15]  (Pl.'s Resp., at 5.)  In Plaintiffs' view, Merlin made only a "tentative identification," not a "positive" one; thus, in his deposition, Merlin testified, "I made very clear never to say that that's the guy due to me not being sure that was the guy. . . . I couldn't be sure that's the guy."  (*Id.* at 5-8 (quoting Merlin Dep., at 41).)  Defendants dispute Merlin's version; indeed, McMahon testified that Merlin told him Merlin was "sure" that the man in the photo was the man who had robbed him. (McMahon Dep., at 52, 54.)  Notably, although Merlin testified that he "never said that I was sure it was him, because I wasn't sure it was him," (Merlin Dep., at 19), he also testified that when he picked Kruse, he told McMahon "he looks like the guy who did it. . . . that looks like him."  (*Id.* at 24.) He further testified that he told McMahon that other than the absence of the scar and the White Sox clothes, the picture he identified looked "very very much like the person" who robbed him, and that if the man in the photo had a scar, the photo would be "very very accurate."  (*Id.* at 26.)  Merlin admits that he told McMahon that "[w]ith the scar, it would look even more like him, possibly be him."  (*Id.* at 19.)  Merlin expressed reservations over the absence of a scar and White Sox paraphernalia, but identified no other specific basis for uncertainty.  Of course, the mere fact that a suspect was not wearing the same clothes in a mug shot as when allegedly committing the crime is insignificant.  The scar is arguably a more serious discrepancy, but  McMahon knew that the mug shot photograph was taken on March 5, 2002, (Def.'s 56.1 ¶ 14; McMahon Dep., at 110-11), and that the robberies occurred more than five months later.

---

[15]     Plaintiffs disclaim any argument that the photo array itself was unconstitutional. (Pl.'s 56.1 Addnl. ¶ 6 (stating that Plaintiffs "do[] not contest the photographic lineup per se").)

Plaintiffs emphasize that Merlin never told McMahon that he was "100% certain that Michael Kruse was the offender." (Pl.'s Resp., at 5; Def.'s 56.1 ¶ 23.) This, however, is not the standard for probable cause. As noted, probable cause is established where the victim has "positively identified" the suspect, and the police have "no reason to disbelieve" the victim. *Tangwall*, 135 F.3d at 516. Plaintiffs cite no authority suggesting that "positive" means "100 percent certain." Moreover, it is undisputed that Merlin picked Kruse's photograph out of an eight-photo lineup in less than a minute, and that McMahon considered Merlin's identification credible. (Def.'s 56.1 ¶¶ 19-20). If the evidence merely shows that Merlin now has reservations about his identification of Kruse, such evidence would not defeat the conclusion that he made a positive identification sufficient to support the issuance of a warrant for Kruse's arrest.

Plaintiffs urge that McMahon was also aware of "evidence that tended to negate probable cause," however, including that Merlin's descriptions varied; that McMahon had learned that Kruse was living out of state at the time of the robberies; that Kruse provided an "easily verifiable alibi" after his arrest when he told McMahon he was working at Perdue Chicken in Tennessee in August 2002; and that Kruse did not have a scar when he was arrested. (Pl.'s Resp., at 6-7, 10.) Citing the Seventh Circuit's decisions in *Sornberger*, 434 F.3d 1006, and *BeVier v. Hucal*, 806 F.2d 123 (7th Cir. 1986), Plaintiffs argue that these factors, combined with Merlin's "tentative identification," negated probable cause and imposed upon McMahon a duty to further investigate before seeking the arrest warrant. (Pl.'s Resp., at 7, 10.) The court is less certain that these differences were so great that a reasonable officer would have been suspicious of Merlin's motives. *See Beauchamp*, 320 F.3d at 743; *Askew*, 440 F.3d at 895-96 (finding discrepancy between radio dispatch, describing assailant with gun, and statements by witnesses at scene of assailant with knife, not significant enough to negate probable cause or suggest that witnesses "were out to frame" plaintiff). Nor are Kruse's alibi, furnished after his arrest, or the absence of a scar at that time relevant as to

whether probable cause existed when McMahon sought the warrant.[16]  *See Beauchamp*, 320 F.3d at 742-43 (existence of probable cause determined as of when officer sought warrant); *Tangwall*, 135 F.3d at 516 (difference between description and defendant's appearance when arrested immaterial for probable cause purposes).

The circumstances in *Sornberger* and *BeVier* are more egregious than those here. In *Sornberger*, a married couple brought § 1983 claims, alleging arrest without probable cause, after spending four months in jail for a bank robbery they did not commit.  434 F.3d at 1010.  Only one bank employee saw the robber's face, describing the man as 5'9" and clean shaven, with dark hair, dark eyes, and a dark complexion. *Id.*  Upon viewing surveillance video, another employee remarked that the robber "looked like" Scott Sornberger, a bank customer; after watching the footage again, however, the same employee said he was not sure. *Id.*  When the police sought out Mr. Sornberger for questioning, they found a man standing 5'11'', with a mustache, blond hair, blue eyes, and a fair complexion. *Id.*  Despite providing alibis, both Sornbergers were arrested. *Id.* at 1011.  Reversing the district court's holding that police had probable cause for the arrest as a matter of law, the Seventh Circuit concluded that three factors "weigh[ed] heavily" against the existence of probable cause: first, that Mr. Sornberger "did not even come close to matching" the eyewitness description; second, that the employee who initially identified Mr. Sornberger from video footage then told police there was no resemblance; and third, that the footage was of such low resolution as to be inconclusive. *Id.* at 1014.

In this case, in contrast, the only differences between the man Merlin picked from the photo array and the Hillcrest Video robber were the lack of a White Sox hat and jersey, and the absence of a small scar.  In *Sornberger,* the police were well aware that Mr. Sornberger bore no resemblance whatsoever to the robber *before* he was arrested; McMahon had no such knowledge

[16]     The court addresses any constitutional claims arising from Kruse's continued detention after his arrest *infra*.

when he sought the warrant.  Nor did Merlin's identification demonstrate anything like the level of uncertainty shown by the employee who identified Mr. Sornberger from the surveillance video and then later recanted.  It is undisputed that Merlin repeatedly told McMahon that Kruse "looked like" the robber when viewing the photo array, and although Merlin now claims he was not "100% positive," he never made any comment to the effect of "that does *not* look like" the robber.  Finally, the low resolution of the video footage in *Sornberger* is not analogous, as Plaintiffs suggest, to the unhelpful footage from Hillcrest Video; there, the employee based his initial identification on that poor quality footage, and here, Merlin identified Kruse from a mug shot, the quality of which Plaintiffs do not challenge.  No identification was based on the Hillcrest Video footage in this case.

Plaintiffs, contending that McMahon should have investigated further before seeking a warrant, quote language from *BeVier* in which the Seventh Circuit stated: "A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest."  806 F.2d at 128.  Plaintiffs then cite the case as standing for the proposition that "reasonable avenues of investigation must be pursued when it is unclear who committed the crime."  (Pl.'s Resp., at 10.) More precisely, the *BeVier* court explained that "[r]easonable avenues of investigation must be pursued especially when, as here, it is *unclear whether a crime had even taken place.*"  806 F.2d at 128 (emphasis added).  The defendant police officer in *BeVier* saw two sunburnt, filthy, and listless children, one of whom had a diaper rash, sitting in the sun on a hot day.  He promptly arrested the parents for child neglect without questioning the teenager who was watching the children.  *Id.* at 125.  An element of the crime required that the parents acted willfully or knowingly, meaning the officer needed some evidence that the parents knew of their children's condition but failed to prevent it.  *Id.* at 126.  Because the officer had no evidence or information as to the parents' intent, there was no probable cause as to whether a crime had occurred.  *Id.* at 127-28. *See Askew*, 440 F.3d at 895 (noting that *BeVier* represents an exception to the rule that probable cause is usually established by eyewitness allegations).  Here, of course, it is undisputed that the

27

Hillcrest Video robber committed a crime; *BeVier* is thus inapplicable. *See Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 525 (7th Cir. 2001) (holding that *BeVier* imposed no duty to further investigate where the plaintiff argued that two women's identification of a naked man in the woods was too tentative to provide probable cause; there was no question that the naked man—whoever he was—had committed a crime).

### B.    Constitutional Concerns After Kruse's Arrest

Plaintiffs argue that once he had arrested Kruse without probable cause, McMahon should have taken "steps to develop probable cause" by promptly investigating Kruse's alibi and by running an in-person lineup for Merlin to view.  (Pl.'s Resp., at 7, 10.)  As explained above, Kruse was not arrested without probable cause: probable cause existed at the time of Kruse's arrest due to the valid outstanding warrant for disorderly conduct from Chicago Ridge, and may well have existed at the time McMahon sought the warrant for armed robbery, based on Merlin's identification and the information McMahon received from Detective Cokete.  There was thus no need for McMahon to further "develop" probable cause by bringing Merlin in to view a lineup.  *Cf. BeVier*, 806 F.2d at 128 (arresting officer should have investigated further to establish probable cause where there was no evidence that the suspects acted willfully or knowingly, which was a required element of the crime).  Although Plaintiffs contend that McMahon needed to investigate further once he had Kruse in custody and discovered that Kruse did not have a scar, this discrepancy between a witness's description and a suspect's appearance when arrested does not obviate the initial determination of probable cause.  *See Tangwall*, 135 F.3d at 516.

Nor did the Fourth Amendment require McMahon to investigate Kruse's alibi once probable cause existed.  *See Eversole v. Steele*, 59 F.3d 710, 718 (7th Cir. 1995) (citation omitted) (once a police officer has established probable cause, the officer has "no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence").  Officers may "act on the basis of inculpatory evidence without trying to tote up and weigh all

28

exculpatory evidence." *Hernandez*, 455 F.3d at 775. Because it is for the courts, and not the police, to determine whether to credit a suspect's claim of innocence or an eyewitness account, police are entitled to rely on information that may turn out to be inaccurate. *Id.*; *Askew*, 440 F.3d at 896 ("The Constitution permits [police] to initiate the criminal process and leave the sifting of competing claims and inferences to detectives, prosecutors, judges, and juries in the criminal prosecution.") In short, "[a]ll the police need is probable cause, which is well short of certainty." *Hernandez*, 455 F.3d at 775.

With probable cause satisfied, any constitutional claims arising out of Kruse's detention following his arrest are governed not by the Fourth Amendment, but by the Due Process clause of the Fourteenth Amendment. *See Wilkins v. May*, 872 F.2d 190, 194 (7th Cir. 1989) (rejecting the concept of "continuing seizure" and holding that the Fourth Amendment does not govern constitutional claims arising from the period after a person is arrested); *Jones v. City of Chicago,* 856 F.2d 985, 994 (7th Cir. 1988) (noting that "at some point after a person is arrested," the analysis of a defendant's continued detention "passes over from the Fourth Amendment to the due process clause"); *Patton v. Przybylski*, 822 F.2d 697, 700-01 (7th Cir. 1987) (explaining that plaintiff's claim for wrongful incarceration would be analyzed "under the Fourth Amendment if the arrest was improper, or under the due process clause if the arrest was proper"). To show a Due Process violation from McMahon's alleged failure to immediately confirm Kruse's alibi, Plaintiffs would have to show that he exhibited "deliberate indifference" that "shocked the conscience." *See Bublitz v. Cottey,* 327 F.3d 485, 490 (7th Cir. 2003). Only "deliberate action intended to harm another" rises to the level of a Due Process violation. *Id.* at 491.

Kruse advised McMahon of his Perdue Chicken alibi on the morning of Sunday, May 16, 2004. (Def.'s 56.1 ¶ 29; McMahon Dep., at 78-80.) The record shows that McMahon did not place any calls to Perdue Chicken to confirm this alibi until Tuesday, May 18, 2004. (Def.'s 56.1 ¶ 31; McMahon Dep., at 93.) Although Plaintiffs accuse McMahon with thus having "dragged his feet,"

(Pl.'s Resp., at 10), this delay does not give rise to a constitutional violation. Plaintiffs' argument that McMahon had a Fourth Amendment duty to confirm Kruse's alibi or to further investigate hinges on their assertion that probable cause did not exist; as the court has concluded that the arrest was lawful, Plaintiffs' argument fails. Nor does the evidence show that McMahon's delay in calling Perdue Chicken evinces such deliberate, "conscience-shocking" behavior as would support a Due Process violation. *See Bublitz,* 327 F.3d at 491. Plaintiffs do not contend, and the record does not support, that McMahon deliberately attempted to harm Kruse by not immediately calling Perdue Chicken to confirm Kruse's alibi.

Plaintiffs also do not contend that due process was violated when McMahon, after receiving the May 20, 2004 fax from Perdue Chicken containing time cards with Kruse's social security number, nonetheless insisted on obtaining from Perdue a hard copy of Kruse's employee ID photograph. Indeed, as with McMahon's delay in calling Perdue, there is no evidence that McMahon's asking Perdue to mail the photograph, after the faxed copy "came out solid black," (McMahon Dep., at 98), exhibited "deliberately indifferent" or "conscience-shocking" behavior. *See Bublitz,* 327 F.3d at 490-91. McMahon's rationale for doing so is disappointing: Despite having received time cards confirming that someone with Kruse's name and social security number had been working at Perdue Chicken in Tennessee at the time of the robberies, he did not consider Kruse's alibi "positive" purportedly because of concerns over "identity theft." (McMahon Dep., at 98-99.) The court sees no plausible basis for such a concern here, where Michael Kruse was in custody and insisting that he himself had been working at Perdue Chicken during the very period indicated on the time cards. And McMahon's comment that "[y]ou can't just let somebody go and say he is innocent until you prove it 100 percent[,]" (*id.* at 99), shows a disturbing lack of concern not only for the civil rights of a suspect in custody who was likely innocent of the armed robbery charge, but also for the fact that the actual perpetrator of the crime may have eluded arrest. Nevertheless, because there was a valid outstanding warrant, McMahon's actions, as noted, are

evaluated under the Due Process clause, and do not exhibit the level of culpability required to support a claim under that doctrine. Plaintiffs have thus failed to show that McMahon inflicted any constitutional injury to Kruse.[17]

### C.    Qualified Immunity

Because the court has concluded that McMahon did not violate Kruse's constitutional rights by arresting him without probable cause or detaining him in violation of due process, the court need not reach the issue of whether McMahon was entitled to qualified immunity for his actions. *See Russell v. Harms*, 397 F.3d 458, 462-63 (7th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) ("In assessing plaintiffs' § 1983 claim, we must determine at the threshold whether the facts viewed in their favor establish a violation of the Fourth Amendment. . . . Only if we answer that question in the affirmative do we address whether the officers are protected by qualified immunity."). The court therefore also need not consider Plaintiffs' argument that McMahon cannot invoke qualified immunity because he misrepresented the certainty of Merlin's identification of Kruse to the judge that issued the warrant. The court observes, however, that such misrepresentations could overcome Defendant's assertion of qualified immunity only if Plaintiffs had evidence that McMahon "entertained serious doubts as to the truth of [his] statements, had obvious reasons to doubt the accuracy of the information reported, or failed to inform the judicial officer of facts [he] knew would negate probable cause." *See Beauchamp*, 320 F.3d at 742-43 (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)) *Id.* at 743. Plaintiffs have not made such a showing; and, in any event, the existence of the outstanding Chicago Ridge warrant defeats the false arrest claim.

### CONCLUSION

For the reasons stated above, the Palos Hills Defendants' motion for summary judgment

---

[17]    In response to Defendants' motion for summary judgment, Plaintiffs explicitly state that they "do[] not advance a *Brady* violation" resulting from McMahon's decision not to contact the public defender or the State's Attorney when he received the faxed documents supporting Kruse's alibi on May 20, 2004. (Pl.'s 56.1 Addnl. ¶ 7.)

(78) is granted.

ENTER:

Dated:  January 11, 2007

_____
REBECCA R. PALLMEYER
United States District Judge